IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

STACIE R. CHVATIK,

                Plaintiff,                    OPINION AND ORDER

v.

                                                22-cv-309-wmc

MARTIN O'MALLEY,[1]
COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

Plaintiff Stacie Chvatik seeks judicial review of a final decision of the Commissioner of the Social Security Administration ("the Commissioner"), finding her not disabled within the meaning of the Social Security Act. Specifically, she contends that Administrative Law Judge ("ALJ") Corey Ayling's decision did not adequately address Chvatik's subjective reports of pain and ignored evidence of her strength deficits, as well as cherry-picked and improperly considered other evidence. For the reasons explained below, however, the court is unpersuaded by these criticisms and will affirm the Commissioner's decision.

BACKGROUND

A. Application and Medical History

Chvatik applied for disability benefits and supplemental security income on April 17, 2020, based on various conditions, including predominant impairments of fibromyalgia (widespread musculoskeletal pain), carpal tunnel syndrome, and cubital tunnel syndrome.

---

[1] Consistent with this court's ordinary practice, it has substituted the name of Kilolo Kijakazi for that of the current Commissioner, Martin O'Malley.

(AR 236, 251.)[2]  She also claimed an onset date of May 1, 2019, when she was 47 years old (AR 78, 282), the day after which she underwent a surgical release of her right-sided cubital and carpal tunnels. (AR 336.)

At a post-operation appointment, however, Chvatik reported improved range of motion and overall comfort level, including a "complete resolution of her preoperative numbness and tingling." (*Id*.) Further, in June 2019, her primary care physician, Dr. Aistis Tumas, concluded that Chvatik "had good benefit already from the surgery." (AR 706.) Dr. Tumas also noted that Chvatik's fibromyalgia was "relatively well controlled" with gabapentin and Cymbalta. (*Id*.) That same month, Chvatik reported "dramatic improvement" in the pain in her right hand, along with renewed use of her right arm for light lifting and carrying in daily activities without difficulty. (AR 356.)

Still, after again reporting pain in her right wrist and elbow, Chvatik began occupational therapy in mid-August 2019, although the occupational therapist initially found Chvatik had a "good prognosis." (AR 584, 586-87, 696.) Discharged from occupational therapy one month later, Chvatik reported decreased pain and discomfort, plus a full range of motion. (AR 604.) Next, in October 2019, Chvatik began physical therapy to address continued numbness in her right arm, pain and stiffness in her elbow and forearm, and reduced grip strength. (AR 609.) By January 2020, she also reported reduced paresthesia, and an improved ability to move her right elbow and wrist. (AR 611, 641.)

---

[2] Citations are to the administrative record. (Dkt. #8.)

In February 2020, the physical therapist noted that Chvatik had a fibromyalgia flare-up with pain in her neck, lower back, and right knee. (AR 653.) Then, at an appointment in early May 2020, Dr. Tumas noted that Chvatik "had some lingering ulnar area paresthesias of her right arm since the surgery," but occupational therapy seemed to provide some benefit. (AR 678.) As to fibromyalgia pain, Dr. Tumas observed that the combination of gabapentin and Cymbalta was "helpful," and a hot tub gave her "some relief." (*Id*.)

By June 2020, however, Chvatik informed her physical therapist of continued spinal pain, in addition to symptoms in her right upper arm, limiting her ability to participate in daily activities. (AR 1326-27.) In August 2020, she also complained to Dr. Tumas of "worsened pain . . . essentially everywhere," due to her fibromyalgia, although reporting that physical therapy seemed to provide some relief. (AR 1405.) In response, Dr. Tumas increased her gabapentin dosage, and in September 2020, Tumas referred Chvatik to a rheumatologic nurse practitioner for additional treatment options. (AR 1428.)

At the initial appointment with the rheumatologic specialist, Chvatik complained of "global aches and pains," only finding "modest relief" with gabapentin, Cymbalta, and physical therapy, but the specialist found no evidence of tenderness, synovitis (inflammation of joint connective tissue), effusion (abnormal collection of fluid), significant weakness, or abnormal motion in any joint. (AR 1428, 1431.) In May 2021, Chvatik was also discharged from therapy by the physical therapist, who noted that she was "able to manage her chronic pain fairly well," and she felt her pain generally was "quite manageable." (AR 1435-36.) Finally, as of July 2021, while Chvatik reported that she felt

3

"worsened pain essentially all over her body," Dr. Tumas noted "no visible effusions or palpable effusions of her wrist or her fingers."  (AR 1513-16.)

### B. Denial of Benefits

Following her application for benefits, two state agency physicians found that Chvatik had severe impairments but concluded that she was still capable of a full range of light work.  (AR 64, 92.)  At a disability hearing before ALJ Ayling in September 2021, Chvatik testified that she had pain in both arms and legs, her neck, and above her right eye.  (AR 39.)  Following that hearing, the ALJ issued a decision unfavorable to Chvatik.  Specifically, the ALJ credited her with the following severe impairments: fibromyalgia; carpal tunnel syndrome and cubital tunnel syndrome on the right side following a surgical release; and right lateral epicondylitis (tennis elbow).  (AR 15, 26.)  After considering her subjective complaints of pain and reduced grip/grasp strength, her "benign" clinical findings, and regular physical activity, however, the ALJ agreed with the state agency physicians that Chvatik retained the residual functional capacity ("RFC") to perform light work, with certain, additional limitations.  (AR 20-24.)

## OPINION

The question before this court is whether the ALJ's decision is supported by substantial evidence, which means "sufficient evidence to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (alteration adopted and quotation marks omitted).  While "the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination," *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014), this meant that the ALJ must identify "such relevant

4

evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek* 139 S. Ct. at 1154 (quotation marks omitted). Accordingly, this court may not "reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute [its] judgment for the ALJ's determination so long as substantial evidence supports it." *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). Here, plaintiff argues that the ALJ did not support his conclusion with sufficient evidence to overcome evidence of her pain, strength deficits, and limited physical activities. Taking each criticism in turn, as well as accusations that the ALJ "cherry picked" more favorable evidence, the court will uphold the ALJ's reasoning for the reasons set forth below.

### I. Plaintiff's Pain

Plaintiff principally argues that the ALJ only summarized medical evidence related to subjective reports of pain without actually analyzing her underlying medical complaints. When evaluating subjective symptoms, an ALJ considers a range of regulatory factors, including the objective medical evidence, the claimant's daily activities, allegations of pain, other aggravating factors, types of treatment received and medication taken, and "functional limitations." *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009) (*citing* 20 C.F.R. § 404.1529(c)(2)-(4)). Even so, courts defer to an ALJ's evaluation of subjective symptoms unless patently wrong, *see Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008), which means that the decision lacked any explanation or support, *Murphy v. Colvin*, 759 F.3d 811, 815-16 (7th Cir. 2014).

Here, the ALJ not only adequately considered plaintiff's subjective reports of pain but credited her symptoms of fibromyalgia with spinal pain and muscle tenderness, while

finding that medications, yoga, and physical therapy were "quite effective," and that she herself had characterized her pain as "manageable."  (AR 24, 1435.)  Moreover, substantial evidence supports the ALJ's conclusion: Dr. Tumas noted in June 2019 that her fibromyalgia seemed to be relatively well controlled with gabapentin and Cymbalta (AR 706); in August 2019, plaintiff reported that her fibromyalgia was under control (AR 696); plaintiff also later reported that she had been making "good progress," finding her pain level to be "more manageable" at times in March 2020 (AR 670); plaintiff reported to Tumas in May 2020 that the combination of gabapentin and Cymbalta was helpful, and a hot tub provided some relief (AR 678); and when she was discharged from physical therapy in May 2021, her physical therapist noted that she was "able to manage her chronic pain fairly well," and she felt that her pain was "quite manageable."  (AR 1435-36.)

In fairness, some evidence runs counter to the ALJ's conclusion, as plaintiff consistently reported pain, even in August and September 2020, when she reported "worsened pain . . . essentially everywhere," with only modest relief from medication and physical therapy.  (AR 1405, 1428.)  Even more concerning, plaintiff reported "worsened pain essentially all over her body" at a July 2021 appointment with Dr. Tumas.  (AR 1513.)  Further, plaintiff testified at the evidentiary hearing before the ALJ that she continued to experience pain in both arms and legs, her neck, and above her right eye.  (AR 39.)  However, the ALJ did *not* ignore plaintiff's subjective reports of pain, but rather acknowledged those reports as continued effects of her fibromyalgia, and thus, he limited her to occasional performance of "postural maneuvers" to avoid exacerbating her symptoms.  Moreover, no doctor suggested greater restrictions were necessary than the ALJ adopted in plaintiff's RFC.  (AR 24-25); *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir.

6

2004) ("More importantly, there is no doctor's opinion contained in the record which indicated greater limitations than those found by the ALJ.")

Plaintiff also asserts that the ALJ improperly failed to follow SSR 12-2p, which provides guidance on evaluating fibromyalgia, by not assessing her subjective statements, but that policy ruling "limits only the evidence used to *diagnose*" fibromyalgia as a medically determinable impairment, not "the evidence an ALJ can consider in evaluating the *severity* of fibromyalgia for purposes of determining a residual functioning capacity." *Gebauer v. Saul*, 801 F. App'x 404, 410 (7th Cir. 2020) (emphasis in original). And here, the ALJ credited the diagnoses of fibromyalgia, while properly evaluating its periodic and long-term impacts on plaintiff's ability to do light work with limitations.

Finally, plaintiff argues that the ALJ overstated the efficacy of her treatments by describing them as "effective," when she had only reported during medical exams that the hot tub provided "some relief," and gabapentin and Cymbalta were "helpful." (AR 678.) However, the ALJ's word choice is not reason to reverse his general finding. Plaintiff also fairly points out that the ALJ did not address reports that she: (1) experienced fatigue and memory issues she thought "might be related to the gabapentin," because the drug made her tired and caused her to fall asleep frequently; and (2) tried a different medication other than gabapentin but restarted it after the pain became too severe. (AR 653, 678, 1405.) However, side effects do not necessarily mean that gabapentin was ineffective, and the ALJ did not need to address every piece of evidence in the record, particularly when she only reported that her fatigue and memory issues "might be related to the gabapentin," and there being no evidence as to the intensity of her reported side effects. (*See* AR 678); *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009).

7

**II. Plaintiff's Strength Deficit**

Although there is mixed evidence about plaintiff's weakness in her upper extremities, the court also has no evidentiary basis to second guess the ALJ's judgment, much less substitute its own judgment. Specifically, the ALJ discussed plaintiff's surgeon's recommendation that she restrict weight bearing activities post-surgery, and her physical therapist documented limited pinch and grip strength in her right hand and arm in 2019 and 2020. (AR 21-24.) Moreover, while her surgeon initially imposed weight restrictions (AR 338), the surgeon noted by June 2019 that plaintiff was able to use her right arm for light lifting without concerns. (AR 356.) And though plaintiff was less optimistic about its benefit by August 2019, noting that she still had pain in her hand (AR 696), and a few months after surgery, her occupational therapist already noted limited grip and pinch strength and limited use of her hand for daily living tasks; however, her occupational therapy discharge notes stated that though still not meeting her goal of increasing her right grip strength for ease of opening jars she was expected to progress towards that goal. (AR 586-87, 605.)

Still, sufficient evidence supports the ALJ's ultimate conclusion that her upper extremity strength was "intact," as she performed tasks that required upper body strength like serving as a caretaker for her disabled brother (including assisting with physically transferring him), and painting; and although her symptoms limited her tolerance for these

8

types of tasks (AR 653), she had improved from 4-/5 to 4/5 strength in her upper extremities to 4/5 to 4+/5 strength by June 2020 (AR 541, 1333).[3]

**III. Evidence of Physical Activity and Treatment**

Plaintiff next criticizes the ALJ for relying in part on her reported physical activity and treatment decisions in finding her not disabled. As for the assertion that the ALJ improperly relied on plaintiff's ability to participate in physical activities, an individual's "ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time." *Roddy v. Astrue,* 705 F.3d 631, 639 (7th Cir. 2013). However, in this case, the ALJ only considered plaintiff's ability to do daily activities as one factor supporting his conclusion that she could perform light work duties. (AR 23-24.) Importantly, as discussed above, the ALJ mainly relied on factors including but not limited to the diagnoses from her treating physicians and plaintiff's own statements regarding her symptoms.

As for the assertion that the ALJ improperly relied on plaintiff's apparent decision to not attend a fibromyalgia program despite being referred to one, the ALJ only noted that the plaintiff was referred to a program but did not attend it or return to the rheumatologist or any other fibromyalgia specialist. (AR 23.) While an ALJ must consider potential reasons for the lack of treatment before drawing an "adverse inference from lack of compliance with treatment recommendations," *Hughes v. Saul*, No. 18-CV-0378-SLC,

---

[3] A person with 4/5 strength is able to provide, "[m]ovement against at least some resistance supplied by the examiner." *How to Assess Muscle Strength*, Merck Manuals, https://www.merckmanuals.com/professional/neurologic-disorders/neurologic-examination/how-to-assess-muscle-strength.

2019 WL 4744902, at *10 (W.D. Wis. Sept. 30, 2019), there is no evidence here that the ALJ drew a negative inference from plaintiff's apparent failure to attend a fibromyalgia program. Thus, he need not have discussed that plaintiff did not attend the program because it was full. (AR 1513.) To the contrary, the ALJ acknowledged that even though plaintiff did not attend the fibromyalgia program, she continued with physical therapy and appointments with Dr. Tumas *for fibromyalgia*. (AR 23.)

## IV. The ALJ did not Cherry-Pick Evidence

Plaintiff further asserts that the ALJ cherry-picked evidence by ignoring her: (1) chondromalacia diagnosis (softening of cartilage inside a joint); and (2) hypermobility in her knees and hips. *First*, even though the ALJ did not specifically address plaintiff's chondromalacia diagnosis (AR 345), he acknowledged the pain and stiffness in her right knee. (AR 22.) Regardless, the evidence of record reveals that by April 2018, the chondromalacia condition had "no obvious pathology," and her doctor prescribed a brace, noting that "[a]s long as she is content[,] . . . no further evaluation will be required." (AR 345.) *See Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016) (A claimant is not entitled to remand if she "does not identify medical evidence that would justify further restrictions."). *Second*, plaintiff asserts that the ALJ erred by ignoring evidence of hypermobility in her knees and hips, but contrary to this assertion, the ALJ actually took note of the physical therapist's finding of "joint hypermobility." (AR 22, 670-71.) As importantly, the ALJ also noted that even with this diagnosis, plaintiff had a normal range of motion by her mid-September 2020 rheumatology appointment. (AR 23, 1431.)

Finally, for the first time in her reply brief, plaintiff claims that the ALJ somehow improperly "played doctor" in finding only minimally persuasive state agency physicians' medical opinions that plaintiff was capable of the full range of light work. To begin, plaintiff waived this argument by raising it for the first time in her reply brief. (Pl.'s Reply Br. (dkt. #18) 7-10); *Wonsey v. City of Chicago*, 940 F.3d 394, 398 (7th Cir. 2019). Moreover, there was no evidentiary gap because after considering the agency physicians' opinions, the ALJ adequately referred to ample medical evidence in the record supporting his finding that plaintiff was *more limited* than those physicians found. In particular, the ALJ explained that their opinions had failed to "give adequate consideration to residual effects of fibromyalgia and surgical releases of her right-sided cubital and carpal tunnels." (AR 24.)

Accordingly, plaintiff has failed to identify a sufficient basis for this court to reverse or remand this case back to the Commissioner.

ORDER

IT IS ORDERED that plaintiff Stacie Chvatik's motion for summary judgment is DENIED and the decision of the Commissioner of Social Security is AFFIRMED. The clerk of court is directed to enter judgment and close this case.

Entered this 20th day of August, 2024.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

11